UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CREAGRI, INC., a California corporation, ) | Case No.: 5:11-CV-06635-LHK |
| ) | |
| Plaintiff, ) | |
| ) | ORDER DENYING PLAINTIFF'S |
| v. ) | MOTION TO DISQUALIFY |
| ) | DEFENDANT'S EXPERT WITNESS |
| PINNACLIFE INC., a Nevada corporation, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff CreAgri, Inc. ("CreAgri") brings this action against Defendant Pinnaclife, Inc. ("Pinnaclife") for infringement of U.S. Patent No. 6,416,808 (filed Aug. 31, 2001) ('808 Patent) and U.S. Patent No. 8,216,599 (filed Feb. 13, 2003) ('599 Patent). *See* ECF No. 50. Before the Court now is CreAgri's Motion to Disqualify Pinnaclife's expert Dr. Francesco Visioli due to Dr. Visioli's prior work as a consultant to CreAgri. ECF No. 79-2 ("Mot."). Pinnaclife has filed an opposition, ECF No. 88 ("Opp."), and CreAgri has filed a reply, ECF No. 94 ("Reply"). This Court held a hearing on the disqualification motion on October 31, 2013. During the hearing, the Court granted leave for Pinnaclife to file a surreply to respond to several documents attached for the first time to CreAgri's reply brief, and Pinnaclife has done so. ECF No. 138-2 ("Surreply"). Having considered the briefing, relevant law, and arguments made during the hearing, the Court DENIES CreAgri's Motion to Disqualify Dr. Visioli.

## I. BACKGROUND

### A. Issues in the Case

The patents-in-suit concern the composition and uses of phenolic compounds derived from olive mill waste water—the byproduct of olive oil production. The '808 Patent claims compositions of olive-derived dietary supplements, and the '599 Patent claims certain treatments of inflammation using olive plant extract. CreAgri, which makes a product called Olivenol, filed the instant lawsuit against Pinnaclife, which also sells products containing olive-derived phenols, on December 23, 2011, alleging that Pinnaclife infringed the '808 Patent. *See* ECF No. 1. After amendment and a motion to dismiss, CreAgri filed a Second Amended Complaint on January 1, 2013, alleging infringement of both the '808 and '599 Patents. *See* ECF No. 50. The case has proceeded through discovery and claim construction. Pending before the Court while the Court was considering the instant motion were Pinnaclife's Motion for Summary Judgment on Invalidity, CreAgri's Motion for Summary Judgment on Infringement, Pinnaclife's Cross-Motion for Summary Judgment on Non-Infringement, and *Daubert* motions. Trial is scheduled to begin on January 21, 2014.

### B. Dr. Visioli's Relationship with CreAgri

After the 2001 launch of Olivenol in the United States, Dr. Roberto Crea, the founder of CreAgri, first met Dr. Visioli in Italy due to Dr. Visioli's research on olive-based polyphenols. ECF No. 79-3 ("Crea Decl.") ¶ 3. During this meeting, Dr. Crea gave Dr. Visioli samples of Olivenol, with which Dr. Visioli was purportedly impressed. *Id.*

Dr. Crea did not interact with Dr. Visioli again until six years later. *Id.* ¶ 4. In 2007, Dr. Visioli was presenting at a University of California, Davis, conference regarding olive-based polyphenols. *Id.* At this conference, Dr. Crea asked Dr. Visioli whether Dr. Visioli would be interested in serving as a consultant to CreAgri. *Id.* Dr. Visioli agreed. *Id.*

This agreement was memorialized in a June 2007 consultation agreement. *Id.*, Ex. A. Under the terms of that agreement, Dr. Visioli's principal responsibility was developing and researching new applications of olive-derived polyphenolic compounds that CreAgri had purportedly discovered and developed. *Id.*, Ex. A, at 1. The contract was for a one-year period, required Dr.

2

Visioli to work for 12 days (or 96 hours) throughout the year, and contemplated $1,000 per month in compensation for Dr. Visioli's services. *Id.*, Ex. A, at 1-2. Further, the agreement contained a non-disclosure provision, pursuant to which Dr. Visioli agreed not to disclose, during or after his engagement with the company, CreAgri's trade secrets, which included "all materials or information related to [CreAgri's] technology, know-how, plans, proposals, client contracts and client lists and information which have not previously been disclosed to the public at large by duly authorized representatives of the Company." *Id.*, Ex. A, at 3-4.

CreAgri and Dr. Visioli disagree about Dr. Visioli's role at CreAgri immediately after they signed the consultation agreement. Dr. Visioli states that he spoke on the phone with Dr. Crea once a week between June and September 2007. ECF No. 88-2 ("Visioli Decl.") ¶ 5. Dr. Visioli perceived his role as networking with his contacts to increase distribution of CreAgri's products. *Id.* Dr. Visioli contends that he did not receive any confidential information during this three-month window and that he received in total only $1,000, one month's compensation pursuant to the consultation agreement. *Id.* ¶ 6. CreAgri contends, on the other hand, that Dr. Visioli was "involved in meetings where CreAgri's product formulations, development, strategy, and business plans were discussed, including highly confidential and privileged information related to CreAgri's business and is products." Mot. at 3.

The record is somewhat clearer with respect to Dr. Visioli's role in 2008, at the end of and after the formal consultation agreement. Specifically, in minutes from three meetings of a CreAgri partner known as 10-B International ("10-B") concerning the second generation of Olivenol products, Dr. Visioli, a consultant to 10-B, is labeled as the lead scientist. ECF No. 94-2 ("Crea Reply Decl."), Exs. 2-4. These meetings centered on ideas and strategies for how the Olivenol product could be improved through adding new ingredients, such as papaya and evening primrose oil, that are not claimed in the patents-in-suit. During this same period, Dr. Visioli was involved in the launch of Olivenol in Malaysia. Visioli Decl. ¶ 8. In connection with this launch, Dr. Visioli and Dr. Crea (along with other researchers) performed a clinical trial regarding the effects of olive mill waste water on glutathione levels in humans' blood plasma that was published in a food chemistry journal. Crea Reply Decl., Ex. 7.

3

In 2009, Dr. Visioli asked Dr. Crea if Dr. Crea was interested in selling CreAgri's products in Europe. Crea Decl. ¶ 7. Dr. Visioli then presented Olivenol to Elementi Body Care, an Italian cosmetics manufacturer. Visioli Decl. ¶ 9. As a result of this, CreAgri and Elementi entered into a Research Marketing and Sales Agreement, and Dr. Visioli entered into an agreement with CreAgri to receive a commission on any sales. Crea Decl. ¶ 7-8; *id.*, Ex. B. Ultimately, however, CreAgri did not make any sales to Elementi, and accordingly, Dr. Visioli did not receive any commission. *See id.* ¶¶ 7-8.

Moreover, between 2009 and 2011, Dr. Visioli and Dr. Crea exchanged several emails. Crea Reply Decl., Exs. 9, 11, 13, 15, 17. These emails do not appear to contain discussion of any potentially proprietary information. Rather, they are personal discussions and general conversations about the trajectory of business opportunities. *See, e.g., id.* Ex. 15 ("We are moving ahead in Asia . . . and in Europe . . . . In the USA also we have some very good partners to commercialize Hidrox."). The exception to this is a July 4, 2011, exchange, in which Dr. Crea indicated that he is being sued in Malaysia. *See id.*, Ex. 17. Dr. Visioli responded, indicating his displeasure with the lawsuit and suggesting that Malaysian verdicts would not have any effect in U.S. courts. *See id.*, Ex. 17.

### C.  Pinnaclife's Search for an Expert and the Instant Motion

Pinnaclife began searching for an expert on non-infringement and invalidity in November 2012. ECF No. 88-1 ("Goldman Decl.") ¶ 2. Pinnaclife identified seven candidates (including Dr. Visioli), who had the requisite knowledge and expertise. *Id.* ¶ 3. Pinnaclife claims, however, that one of the experts it contacted had a conflict and another did not respond. Opp. at 7. Pinnaclife claims it was "either unable to contact [the other] experts or they were not suitable as experts." *Id.* at 6. Furthermore, Pinnaclife retained a consulting firm to help identify experts, but the potential experts the firm identified were not qualified in Pinnaclife's view. *Id.* at 6-7.

Counsel for Pinnaclife first contacted Dr. Visioli in December 2012, and Dr. Visioli informed counsel at that point that he had previously had a consulting relationship with CreAgri. Goldman Decl. ¶ 4. Dr. Visioli further told counsel that he had no on-going relationship with CreAgri and that he owed no continuing contractual or confidentiality obligations to CreAgri. *Id.*

4

1  Pinnaclife's counsel asked Dr. Visioli not to discuss with Pinnaclife's counsel the details of Dr.
2  Visioli's conversations with Dr. Crea. *Id.* ¶ 5. Pinnaclife retained Dr. Visioli.
3          In January and February of 2013, the parties engaged in a meet-and-confer that spanned
4  multiple emails and a telephone call. After Pinnaclife informed CreAgri on January 17, 2013 that
5  Pinnaclife had retained Dr. Visioli, CreAgri responded on January 31, 2013, by pointing to the
6  consultation agreement that Dr. Visioli had signed. ECF No. 81 ("Lee Decl."), Ex. C. That same
7  day, Pinnaclife responded and stated that Dr. Visioli had received no confidential information. *Id.*,
8  Ex. B. Both in the initial letter and in a letter following a meet-and-confer call on February 7, 2013,
9  Pinnaclife repeatedly stated that the basis for CreAgri's objections were not clear and that CreAgri
10 should more clearly state its objections to Dr. Visioli. *Id.*, Exs. B-D. In the January 31, 2013, letter,
11 Pinnaclife further informed CreAgri that Dr. Visioli would not have access to any documents
12 subject to the protective order in the instant litigation. Pinnaclife also stated that CreAgri should
13 bring any motion to disqualify immediately since CreAgri intended to use Dr. Visioli. *Id.*, Ex. E.
14 CreAgri did not bring any motion in early 2013 and did not more clearly state its objections to Dr.
15 Visioli. On June 17, 2013, Dr. Visioli supplied his initial expert report (a 26-page report on
16 validity),[1] and on July 1, 2013, CreAgri filed the instant motion. *See* Mot.

## II. LEGAL STANDARD

18         "Federal courts have the inherent power to disqualify expert witnesses to protect the
19 integrity of the adversary process, protect privileges that otherwise may be breached, and promote
20 public confidence in the legal system." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087,
21 1092 (N.D. Cal. 2004). There is no bright-line rule to determine whether an expert should be
22 disqualified. *Veazey v. Hubbard,* 2008 WL 5188847, at *5 (D. Haw. Dec.11, 2008). In cases where
23 an expert had a prior relationship with an adversary, district courts consider two questions: first,
24 whether "the adversary had a confidential relationship with the expert" and second, whether the
25 adversary "disclosed confidential information to the expert that is relevant to the current litigation."
26 *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1093. If only one of these elements is present,
27 disqualification of the expert is likely inappropriate. *Id.* District courts must also consider "whether

---

[1] Dr. Visioli has since supplied a 21-page report on infringement. Opp. at 2.

5
11-CV-06635-LHK
ORDER DENYING PLAINTIFF'S MOTION TO DISQUALIFY DEFENDANT'S EXPERT

disqualification would be fair to the affected party and would promote the integrity of the legal process." *Id.*

### III. DISCUSSION

#### A. Confidential Relationship

The Court now turns to the first factor: whether CreAgri maintained a confidential relationship with Dr. Visioli. The critical inquiry with regard to this factor is not whether there was a formal agreement between the adversary and the expert, but rather whether there was a relationship such that the adversary would "reasonably . . . expect that any communication would be maintained in confidence." *Id.* In making this determination, district courts look to a host of factors, such as the length of the relationship, whether the expert was retained to assist in litigation, whether there was a formal confidentiality agreement, and whether the expert derived any of his specific ideas from work done under the direction of the retaining party. *Id.* None of these factors, however, is in and of itself dispositive. For example, an expert will not be disqualified merely because she signed a confidentiality agreement with the adversary. *Id.* at 1094. Importantly, it is the party who is moving to disqualify that bears to burden of establishing a confidential relationship. *See Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C. 1991).

While not dispositive, a formal consultation agreement governed the relationship between Dr. Crea and Dr. Visioli. Crea Decl., Ex. A. Under the terms of that agreement, which was signed in June of 2007, Dr. Visioli agreed to serve as a scientific consultant to CreAgri for one year. *Id.*, Ex. A, at 1. The consultation agreement, pursuant to which Visioli was to be paid $1,000 per month, required Dr. Visioli to develop and research new applications of CreAgri-discovered olive polyphenols. *Id.*, Ex. A, at 1-2. Importantly, as described above, the agreement contained a non-disclosure provision that precluded Dr. Visioli from divulging any of CreAgri's trade secrets during or after the one-year term of the agreement. *Id.*, Ex. A, at 3-4.

Pinnaclife attempts to downplay the nature of the relationship between Dr. Crea and Dr. Visioli during the formal term of the agreement. Specifically, Pinnaclife contends that the relationship was for the purposes of "networking," which suggests that there was no reasonable expectation of confidentiality. Opp. at 12-13. While the Court finds that some of Dr. Visioli's

conversations with Dr. Crea were for the purposes of networking and marketing, other conversations related to the nature of the products and other aspects of the business beyond public relations and marketing. In particular, Dr. Crea and Dr. Visioli discussed CreAgri's competitors in the market. ECF No. 94-1 ("Lee Reply Decl."), Ex. 1 ("Visioli Depo."), at 277. Moreover, Dr. Visioli himself admits that he recognized that portions of his conversations with Dr. Crea were intended to be confidential. *Id.* at 272. The nature of Dr. Crea's discussions with Dr. Visioli and Dr. Visioli's own understanding of this relationship suggests that Dr. Crea reasonably expected that communications with Dr. Visioli would be kept confidential. Further, these discussions and Dr. Visioli's own understanding suggest that this is not a case in which "despite the existence of a formal contractual relationship, so little of substance occur[ed] during the course of the relationship" that there was no confidential relationship. *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 278 (S.D. Ohio 1988). Rather, Dr. Visioli's substantive discussions with Dr. Crea about business plans suggest the existence of a confidential relationship.

Pinnaclife further relies on the fact that Dr. Visioli's relationship with Dr. Crea was formally only for a one-year period, lasted for only three months, and concluded four years before the instant litigation. Opp. at 12-13. The Court is not persuaded. While Pinnaclife is correct that the formal duration of Dr. Visioli's consultation agreement was one year and this formal agreement terminated four years ago, the Court finds that Dr. Visioli's continued contacts with Dr. Crea evince a more enduring relationship. Specifically, many of Dr. Visioli and Dr. Crea's discussions regarding the creation of second-generation Olivenol products occurred after the expiration of the consultation agreement's one-year term. *See* Crea Reply Decl., Exs. 3-4 (meeting minutes in June and September of 2008). Furthermore, it was after the expiration of the consultation agreement, in 2009, that Dr. Visioli made the (ultimately unsuccessful) presentation regarding Olivenol to Elementi on CreAgri's behalf. Crea Decl. ¶ 7; *see also id.*, Ex. B (commission agreement between Dr. Crea and Dr. Visioli regarding Elementi). These continued contacts suggest that Dr. Crea and Dr. Visioli's confidential relationship continued notwithstanding the fact that the consultation

agreement was not renewed.[2] Moreover, despite the fact that Dr. Visioli's formal relationship with CreAgri was limited by the consultation agreement, the confidentiality provision in the agreement did not contemplate a termination date. Rather, the agreement states that Dr. Visioli "shall at all times during the Term of his engagement by the Company, *and thereafter*, hold Trade Secrets in strict confidence and shall not disclose them without prior written consent of the Company." Crea Decl., Ex. A, at 3-4 (emphasis added). Accordingly, the Court finds that Dr. Visioli's relationship with CreAgri was not, as Pinncalife suggests, so short as to be insubstantial. The Court therefore finds that Dr. Visioli and CreAgri had a confidential relationship.

### B. Confidential Information

With regard to the second factor, the sharing of confidential information, district courts look to whether any information shared was of particular significance. *Hewlett-Packard,* 330 F. Supp. 2d at 1094. Specifically, "courts inquire whether the adversary disclosed confidential information to the expert that is relevant to the current litigation." *Kane v. Chobani*, Inc., No. 12-02425, 2013 WL 3991107, at *6 (N.D. Cal. Aug. 2, 2013). Confidential communications include discussions related to the litigation, such as strategy, kinds of experts and their roles, and strengths and weaknesses of each side. *Hewlett-Packard,* 330 F. Supp. 2d at 1094. Courts have held that "technical information as opposed to legal advice is not considered" confidential. *Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 191-92 (S.D.N.Y. 1998). The burden on demonstrating that confidential information was exchanged is on the party seeking to disqualify. *Hewlett-Packard,* 330 F. Supp. 2d at 1094. Accordingly, the party seeking disqualification must "point to *specific and unambiguous disclosures* that if revealed would prejudice the party." *Id.* (emphasis added).

CreAgri in its motion relies exclusively on a conclusory declaration from Dr. Crea to state that Dr. Visioli "received substantial confidential, proprietary and privileged information on CreAgri, including without limitation, information related to CreAgri's business strategies,

---

[2] The degree to which the consultation agreement was followed is not clear from the record. Pinnaclife contends that Dr. Visioli was paid only $1,000 (though the agreement required that he be paid $1,000 per month for the year-long duration of the agreement). At the hearing, CreAgri was unable to state how much Dr. Visioli was paid. The Court finds troublesome CreAgri's inability to provide evidence of Dr. Visioli's compensation, particularly in light of the fact that CreAgri bears the burden on this motion and this type of basic compensation information should be in CreAgri's records.

8
11-CV-06635-LHK
ORDER DENYING PLAINTIFF'S MOTION TO DISQUALIFY DEFENDANT'S EXPERT

intellectual property strategies, legal strategies, competitions, know-how, plans, scientific reports, products and their formulation and development, competitors' products, proposals, data, patents and client contracts throughout his time working with the company."[3] Mot. at 8. The sole documents attached to the declarations supporting CreAgri's instant motion were Dr. Visioli's consultation agreement with CreAgri, the Elementi agreement, and emails exchanged as part of the meet and confer on the instant motion. *See* Crea Decl., Exs. A-B (agreements); Lee Decl., Exs. A-F (meet and confer). CreAgri's broad and conclusory allegations of confidential information in the instant motion fall short of sustaining CreAgri's burden of pointing to "specific and unambiguous disclosures that if revealed would prejudice" CreAgri. *Hewlett-Packard,* 330 F. Supp. 2d at 1094; *see also Life Tech. Corp. v. Biosearch Tech., Inc.*, No. 12-0852, 2012 WL 1604710, at *7 (N.D. Cal. May 7, 2012); *Orion Corp. v. Sun Pharm. Indus., Ltd.*, Nos. 07-5436, 08-5545, 2009 WL 5872982, at *3 (D.N.J. June 12, 2009) ("The party seeking disqualification bears the burden of establishing both the existence of confidentiality and its nonwaiver.").

CreAgri points to more specific documents and emails in its reply brief in support of the instant motion to contend that Dr. Visioli had access to confidential information. Reply at 3-5. However, district courts are not required to consider arguments raised for the first time in reply briefs. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Therefore, CreAgri's failure to meet its burden in its motion is grounds in and of itself to deny CreAgri's motion. Notwithstanding CreAgri's deficient motion, the Court addresses the contentions raised in CreAgri's reply brief because Pinnaclife suffers no prejudice from the Court's consideration of such contentions as this Court granted Pinncalife leave to file a surreply.

CreAgri points to the facts that Dr. Crea and Dr. Visioli had regular discussions; that Dr. Visioli talked to Dr. Crea about competitors in the industry; that Dr. Visioli participated as lead

---

[3] The Court noted at the hearing that the self-serving declarations, created for the purpose of this motion, of both Dr. Crea and Dr. Visioli are less persuasive than the accompanying documentary evidence created during Dr. Visioli's relationship with CreAgri, as Dr. Crea and Dr. Visioli's current declarations merely present a he-said-he-said. *See In re High-Tech Employees Antitrust Litig.*, --- F. Supp. 2d ---, No. 11-2509, 2013 WL 5770992, at *39 (N.D. Cal. Oct. 24, 2013) (explaining that internal documents created contemporaneously with events at issue are more persuasive than litigation-driven documents).

scientist in meetings with CreAgri partner, 10-B, that dealt with the particular formulations of Olivenol; that Dr. Visioli and Dr. Crea published an article based on tests of Olivenol on human volunteers; that Dr. Crea and Dr. Visioli discussed a prospective presentation; that Dr. Crea and Dr. Visioli engaged in discussions regarding the formulation of CreAgri's product; and that Dr. Crea and Dr. Visioli exchanged certain emails. In its surreply, Pinnaclife contends that all of the information to which CreAgri points either is not confidential or is unrelated to this litigation. Surreply at 1-4. The Court now addresses each piece of evidence on which CreAgri relies to contend that Dr. Visioli was given CreAgri's confidential information.

First, citing Dr. Crea's declaration, CreAgri repeats its conclusory claim that Dr. Visioli and Dr. Crea had regular discussions where they discussed "matters related to CreAgri including the formulation of the products, patents, and intellectual property, and differences between CreAgri's products and competitors' products." Reply at 4 (citing Crea Reply Decl. ¶ 4). However, the documents attached to the reply brief shed more light on the communications that CreAgri contends were confidential. In his reply declaration, Dr. Crea states that CreAgri entered into a joint venture with 10-B to develop and promote Olivenol in Asia. Crea Reply Decl. ¶ 4. As part of this agreement, Dr. Crea was hired as the Director of Science and Innovation at 10-B, and Dr. Visioli was later hired as a consultant to 10-B. *Id.* CreAgri contends that in his role as a consultant to 10-B, Dr. Visioli participated in several meetings with Dr. Crea, the minutes of which show that formulations of future Olivenol products and competitor products were discussed.

The Court is not persuaded that any of the information discussed at these meetings was related to the instant litigation. Specifically, most of the references to which CreAgri points in these meeting minutes relate to ingredients that could be added to HIDROX (an ingredient of Olivenol) to create a second-generation Olivenol product. Crea Reply Decl., Exs. 2-4. For example, the participants at the meetings discussed the addition of papaya, palm kernel, evening primrose oil, superoxide dismutase, and Omega 3 to improve Olivenol. *See id.* These additional ingredients, however, appear nowhere in the claims of the patents-in-suit and have no relation to the patents-in-suit or this litigation. Neither CreAgri's arguments at the hearing nor its briefing establishes how information regarding what additional ingredients 10-B was considering relates to the instant

10

litigation, which relates to the enforcement of patents, one of which had already been issued at the time of these meetings.[4] *Cf. Oracle Corp. v. Drug Logic, Inc.*, No. 11-910, 2012 WL 2244305, at *7 (N.D. Cal. Jun. 15, 2012) (finding confidential information was exchanged where the moving party "identified at least three examples of intellectual property that Dr. Nelson helped develop and later conveyed to [a company the moving party subsequently purchased] that are the subject of [the adversary's] infringement contentions"). In sum, because CreAgri fails to establish a connection between the discussions at these meetings and the instant litigation, the Court finds that CreAgri fails to meet its burden of showing that these meetings provided Dr. Visioli with confidential information relevant to the instant litigation.

Second, CreAgri points to correspondence between Dr. Crea and Dr. Visioli regarding an article that they co-authored regarding olive polyphenols. This article stemmed from a clinical trial conducted in 2008 that tested the effects of olive oil wastewater on plasma glutathione levels and antioxidant levels of human subjects. Crea Reply Decl., Ex. 7. CreAgri, however, fails to meet its burden of demonstrating what, if any, portions of these communications were contemplated to be confidential, particularly in light of the fact that the paper was ultimately to be published and was in fact published.[5] To the contrary, it appears that the clinical trial was designed not for internal, confidential use, but for public, marketing purposes. As Dr. Visioli stated in his deposition, he used this clinical study as part of a lecture regarding the beneficial effects of polyphenols. Visioli Depo. at 282.

Third, CreAgri cites an email exchange between Dr. Visioli and Dr. Crea regarding a PowerPoint presentation. Crea Reply Decl., Ex. 10. The PowerPoint presentation at issue, however, was not a CreAgri presentation, but rather contains the logo of a Merck subsidiary known as EMD.

---

[4] The '599 Patent, filed in 2003 and issued in 2012, claims the use of olive plant extract to treat inflammation. The sole discussion of the anti-inflammation qualities is that there was a passing mention in the meeting minutes to "anti-inflammation" as a "direction for strengthening of existing product range." Crea Reply Decl., Ex. 2. CreAgri has not provided any argument regarding how the improvements to its products relate to the issues in the instant litigation.

[5] At the hearing, CreAgri's counsel repeatedly argued that even though specific information was not confidential now (because, for example, it has been published), that the confidentiality of that information at the time it was being discussed by Dr. Visioli and Dr. Crea is sufficient for CreAgri to meet its burden. This misstates the standard. The test for confidential information is not whether the information was confidential at the time that it was communicated, but rather, whether its disclosure now would prejudice CreAgri. *See Hewlett-Packard,* 330 F. Supp. 2d at 1094.

1   Accordingly, it is not clear to the Court that the PowerPoint even contains CreAgri's information.
2   *Id.* In fact, in the email exchange accompanying the presentation, Dr. Visioli asks Dr. Crea whether
3   Dr. Crea is "sure" that they can use this presentation and states that he has deleted all the logos just
4   in case. *Id.*, Ex. 9. Even if the PowerPoint contained CreAgri's information, it is not clear that the
5   information would be confidential. The presentation itself lacks any indicia of confidentiality.
6   CreAgri has not cited any non-disclosure agreement between EMD, the logo of which appears on
7   the presentation, and CreAgri. Moreover, it is apparent that the presentation was designed to be
8   published to third parties. It is not clear from the record who, if anyone, saw the presentation, and
9   whether they were subject to a non-disclosure agreement. In light of the fact that it is not clear that
10  the PowerPoint contains CreAgri information or that the information was confidential to CreAgri,
11  the Court finds that CreAgri has not met its burden of demonstrating that any of the contents of this
12  PowerPoint or affiliated communications are confidential.
13       Fourth and last, CreAgri relies on a series of emails between Dr. Visioli and Dr. Crea.
14  These emails are largely of a general nature. Crea Reply Decl., Exs. 13, 15, 17. For example, in one
15  email, Dr. Crea broadly tells Dr. Visioli that business has been successful in part because CreAgri
16  has found additional business partners. *Id.*, Ex. 15. While these emails suggest that Dr. Visioli and
17  Dr. Crea had an on-going relationship, the Court finds that nothing in these emails is related to the
18  instant litigation. The only mention of even unrelated litigation in these emails is a discussion
19  regarding a lawsuit against Dr. Crea in a Malaysian tribunal. *Id.*, Ex. 17. Yet, CreAgri has not
20  contended that the passing mention to this Malaysian litigation is any way connected to the instant
21  litigation. *See Hewlett-Packard,* 330 F. Supp. 2d at 1097 ("Although [the moving party] contends
22  that he spoke to [the expert] about the case several times between April 2001 and July 2002, [the
23  moving party] notably does not maintain that he discussed anything of substantive importance to
24  the litigation in the course of these conversations . . . ."). Vague, general mentions of litigation are
25  insufficient for the moving party to meet its burden on a motion to disqualify. *Id.* at 1094.
26  Accordingly, the Court finds that CreAgri has failed to make any persuasive argument that the
27  information contained in these emails could plausibly be considered confidential.
28

12
11-CV-06635-LHK
ORDER DENYING PLAINTIFF'S MOTION TO DISQUALIFY DEFENDANT'S EXPERT

1       Ultimately, it is CreAgri, the moving party, that bears the burden of pointing to specific and
2  unambiguous disclosures that suggest that confidential information relating to the litigation was
3  exchanged. *See id.* While CreAgri has pointed to several documents, the Court finds that none of
4  these documents is sufficient, independently or collectively, for CreAgri to meet its burden. *Life*
5  *Tech. Corp.*, 2012 WL 1604710, at *7-8 (holding that "vague assertions" and "superficial
6  similarity" between information exchanged and the litigation is insufficient to meet the burden on a
7  motion to disqualify). At best, CreAgri has shown that Dr. Visioli and Dr. Crea had confidential
8  conversations regarding CreAgri's general business. The Court finds that CreAgri has not met its
9  burden of establishing that the information Visioli received was confidential and related to the
10 instant litigation. As other courts have noted, a failure to demonstrate that confidential information
11 related to the litigation was exchanged between the moving party and the expert is fatal to a motion
12 to disqualify. *Hewlett-Packard,* 330 F. Supp. 2d at 1093 (noting that "disqualification likely is
13 inappropriate" where the moving party has only met its burden with respect to confidential
14 relationship and not with respect to confidential information relevant to the litigation); *see also*
15 *U.S. ex rel. Cherry Hill Convalescent, Ctr., Inc. v. Healthcare Rehab Sys., Inc.*, 994 F. Supp. 244,
16 251 (D.N.J. 1997) ("Despite a relationship conducive to confidential disclosures, I conclude that
17 [moving party] did not impart *significant* confidential disclosures pertaining to the litigation
18 between [moving party] and [adversary] to [the challenged expert]." (emphasis added)).

19       **C.  Fundamental Fairness and Prejudice**

20       The Court nevertheless turns to the third factor—prejudice. In considering fundamental
21 fairness and prejudice, the Court looks to factors such as whether other experts would be available
22 if the expert were to be disqualified and whether disqualification (particularly at late stages of the
23 litigation) is likely to disrupt judicial proceedings. *Hewlett-Packard,* 330 F. Supp. 2d at 1095.
24 "Consideration of prejudice is especially appropriate at late stages in the litigation, at which time
25 disqualification is more likely to disrupt the judicial proceedings." *Life Tech. Corp.*, 2012 WL
26 1604710, at *10.

27       To assess the stage of litigation, a brief restatement of the timeline of Dr. Visioli's
28 involvement in this litigation is in order. Pinnaclife disclosed that it had retained Dr. Visioli in

1   January 2013. Goldman Decl. ¶¶ 4-5; Lee Decl., Ex. A. Shortly thereafter, the parties exchanged a
2   series of letters in which CreAgri notified Pinnaclife that Dr. Visioli had signed a consultation
3   agreement with CreAgri that contained a confidentiality clause. Lee Decl., Ex. C. In response, on
4   January 31, 2013, Pinnaclife contended that Dr. Visioli did not receive any confidential
5   information related to the instant litigation. *Id.*, Ex. B. During a phone call on February 7, 2013, the
6   parties reiterated their positions, with CreAgri maintaining its objections to Dr. Visioli and
7   Pinnaclife contending that CreAgri had not stated what, if any, specific confidential information
8   Dr. Visioli received when he was a consultant. *Id.*, Ex. D. Thereafter, Pinnaclife sent a letter to
9   CreAgri stating that it "intends to use Dr. Visioli as an expert in this case. The burden is on
10  CreAgri to seek and demonstrate grounds for disqualification should you deem it appropriate and
11  any delay in bringing such a motion could potentially prejudice Pinnaclife in light of the Court's
12  scheduling order." *Id.* CreAgri responded to this email by stating that Pinnaclife was utilizing Dr.
13  Visioli "at its own risk." *Id.*, Ex. E. Pinnaclife responded and stated that, "[i]f you think can satisfy
14  the burden for disqualification and get a dq motion granted, then bring it now. Otherwise we are
15  going to use him." *Id.*

16      Meanwhile, in January and February 2013, the parties filed claim construction briefs and
17  this Court held a hearing and tutorial. CreAgri did not notify the Court of any dispute regarding
18  Pinnaclife's expert at this point. In April 2013, this Court issued its claim construction order. ECF
19  No. 67. On April 17, 2013, the Court held a further case management conference at which CreAgri
20  again did not inform the Court of any issues regarding experts. ECF No. 69. In fact, the parties
21  stated that they "do not currently have discovery disputes." ECF No. 65. Discovery continued, and
22  on June 14, 2013, Dr. Visioli submitted his opening expert report. On July 1, 2013, CreAgri filed
23  the instant motion to disqualify Dr. Visioli. *See* Mot. As discussed above, the motion failed to
24  identify any specific confidential information Dr. Visioli received as a consultant to CreAgri. Only
25  in its reply brief, filed on July 30, 2013, a full six months after Pinnaclife's initial request for
26  specificity, did CreAgri even attempt to identify the purportedly confidential information to which
27  Dr. Visioli had access.
28

14
11-CV-06635-LHK
ORDER DENYING PLAINTIFF'S MOTION TO DISQUALIFY DEFENDANT'S EXPERT

In light of this procedural history, the Court finds that disqualifying Dr. Visioli would prejudice Pinnaclife. CreAgri did not file the instant motion or otherwise raise the issues contained in the instant motion to the Court until five months after it discovered that Pinnaclife's expert had a potential conflict and that Pinnaclife was unwilling to withdraw the expert. Furthermore, the motion came a mere two weeks before the close of expert discovery and two months before the filing of dispositive motions, which rely in part on the experts in this case. *See* ECF No. 74.

CreAgri's sole explanation for this delay is that it could not have anticipated what was going to be in Dr. Visioli's expert report. Reply at 10. Accordingly, CreAgri contends, it could not have brought this motion until it saw Dr. Visioli's first report, and it brought this motion weeks after it saw Dr. Visioli's report. *Id.* The Court is not persuaded that any need to see the expert report excused the delay. CreAgri does not cite in the instant motion or reply brief anything from Dr. Visioli's expert report. CreAgri does not rely on Dr. Visioli's expert report to establish that Dr. Visioli had access to confidential information relevant to this litigation. This lack of reliance suggests that it was not something in Dr. Visioli's report that triggered the instant motion.[6] In fact, the lack of citation to Dr. Visioli's report suggests that nothing material for purposes of the instant motion changed between February 2013 when CreAgri should have brought this motion, and July 2013, when it did. Disqualifying Dr. Visioli notwithstanding this unnecessary delay, during which a substantial portion of fact and discovery occurred and fact discovery closed, would prejudice Pinnaclife.[7]

---

[6] CreAgri's counsel conceded as much at the hearing, when he stated that there was nothing specific in the expert report that led to the instant motion.
[7] The Court also considers the availability of other experts in the fairness analysis, but finds this factor neutral. Pinnaclife contends that it attempted to contact other experts during its initial expert search but found other experts conflicted out, had language barriers, otherwise unsuitable, or inaccessible. Opp. at 6-7; Goldman Decl. ¶¶ 2-3. Pinnaclife further interviewed three potential experts that a consulting firm identified, but determined that these experts were unqualified to serve as experts in this case. While the Court has some concerns regarding the extent of Pinnaclife's diligence, the Court nevertheless notes that at the late stage at which CreAgri filed the instant motion, after initial expert reports were exchanged, Pinnaclife would be burdened in seeking a new expert, particularly one with Dr. Visioli's experience in the relevant field. *See U.S. ex rel. Cherry Hill Convalescent, Ctr., Inc.*, 994 F. Supp. at 251 (noting that courts consider not only "whether another expert is available," but also "whether the opposing party will be unduly burdened by having to retain a new expert").

15
11-CV-06635-LHK
ORDER DENYING PLAINTIFF'S MOTION TO DISQUALIFY DEFENDANT'S EXPERT

1    In contrast, the Court finds that not disqualifying Dr. Visioli will not prejudice CreAgri.
2    CreAgri contends that if Dr. Visioli continues in this case, CreAgri will face prejudice since it will
3    not be able to effectively cross-examine Dr. Visioli without revealing CreAgri's confidential
4    information. Opp. at 9-10. However, as discussed above, CreAgri has not met its burden of
5    demonstrating Dr. Visioli was even given confidential information relevant to the instant litigation.
6    CreAgri has also failed to present any categories of information or specific information that it
7    wants to use to cross-examine Dr. Visioli that it would be reluctant to use for fear of waiving
8    privilege. Again, CreAgri's claim proves to be too broad and conclusory.

### D.    Policy Concerns

The last factor the Court considers is other policy concerns that would "achieve the goal of protecting the integrity of the adversary process." *Hewlett-Packard,* 330 F. Supp. 2d at 1095. Under this factor, the Court looks to the incentives that would be created by its grant or denial of disqualification of an expert. *Id.*("It is important to consider other policy concerns in order to achieve the goal of protecting the integrity of the adversary process and of promoting public confidence in the legal system. Such concerns include consideration of the parties' strategic positions, and avoidance of creating troublesome incentives for both experts and the retaining party.") (internal citations and quotation marks omitted). The Court must consider whether disqualifying an expert will incentivize parties to cling to their experts out of fear that withdrawal of their expert will lead to a spread of confidential information or whether disqualifying too easily will incentivize parties to create relationships with numerous experts to preempt adversaries' ability to retain experts. *Id.*

The Court first discusses the incentives that disqualification may create. Specifically, the Court considers whether disqualification would incentivize "unscrupulous attorneys [to] attempt to create relationships with numerous potential experts at a nominal fee hoping to preempt the ability of their adversaries to obtain expert assistance." *Id.* (internal quotation marks omitted)*.* This is not a case in which CreAgri retained Dr. Visioli for the purposes of the instant litigation. Rather, as discussed above, the relationship between CreAgri and Dr. Visioli pre-dated Dr. Visioli's involvement in this case. Therefore, the Court finds that this is not the type of case in which

disqualification would incentivize parties to cursorily retain several experts to prevent adversaries from relying on that expert. *Kane*, 2013 WL 3991107 at *7 (noting that in a situation where the relationship preexisted the litigation, "the Court need not consider the situation in which a party retains an expert solely for the purpose of preempting access to that expert by opposing counsel.").

Nor is this the kind of case in which a failure to disqualify will incentivize future parties to cling to their experts. *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1095 (noting that if disqualification is too difficult, "the retaining party might be motivated not to withdraw a previously designated expert while litigation is pending for fear that the party's confidential information would become available to its adversary."). After all, Dr. Visioli's relationship with Dr. Crea had ended years before the instant litigation due to reasons unrelated to the litigation. Furthermore, Dr. Visioli received no compensation in the several years before the instant litigation began, and even while he was compensated, Dr. Visioli received no confidential information relevant to the litigation. Therefore, not disqualifying him would not create incentives for parties to cling to their experts out of a fear that confidential information will be disclosed to their adversaries if the parties fail to do so.

Accordingly, the Court finds that the particularities of this case, in which Dr. Visioli had a preexisting and substantive relationship with CreAgri years before the litigation commenced, that relationship came to a natural end before the commencement of this litigation, and no confidential information related to the litigation was shared, render it an unlikely matter in which ill incentives, for one party or the other, will be created.

## IV.  CONCLUSION

In sum, the Court finds that CreAgri, despite having had opportunities to do so in CreAgri's motion, reply, and oral argument at the hearing, has failed to meet its burden of establishing that any CreAgri confidential information related to the instant litigation was exchanged between CreAgri and Dr. Visioli. Furthermore, CreAgri's motion is woefully inadequate in meeting this burden, and most of CreAgri's arguments and virtually all of its evidence were raised for the first time in its reply brief, a defect that in and of itself would suffice as grounds to deny the instant motion. Moreover, CreAgri's delay in bringing this instant motion would cause undue prejudice to

1  Pinnaclife, which would have to find an expert at the late stage in the litigation. As a result of the
2  combination of all of these factors, the Court DENIES CreAgri's Motion to Disqualify Dr. Visioli.
3  **IT IS SO ORDERED.**
4  Dated: December 18, 2013

                                              *Lucy H. Koh*
                                              LUCY H. KOH
                                              United States District Judge