UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| CREAGRI, INC., a California Corporation, | ) | Case No.: 11-CV-6635-LHK |
| Plaintiff, | ) ) | ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES |
| v. | ) ) | |
| PINNACLIFE, INC., a Nevada Corporation, | ) ) | |
| Defendant. | ) ) | |

Defendant Pinnaclife, Inc. ("Pinnaclife") brings two motions to recover attorneys' fees from Plaintiff CreAgri, Inc. ("CreAgri") arising out of a patent infringement action brought by CreAgri. CreAgri sued Pinnaclife for infringement of U.S. Patent No. 6,416,808 (issued from an application filed Aug. 31, 2001) ("the '808 Patent") and U.S. Patent No. 8,216,599 (issued from an application filed Feb. 13, 2003) ("the '599 Patent"). *See* ECF No. 50. The Court found both patents invalid and granted summary judgment in favor of Pinnaclife. ECF No. 177 ("SJ Order"). Pinnaclife moves for attorneys' fees under both 35 U.S.C. § 285 and Rule 11 of the Federal Rules of Civil Procedure. The motions are fully briefed. Having reviewed the parties' submissions, the record in this case, and the relevant law, the Court DENIES both of Pinnaclife's motions for attorneys' fees.

## I.      BACKGROUND

### A.      Factual Background

CreAgri and Pinnaclife both sell products, including dietary supplements, containing olive-derived phenolic compounds intended to promote health. ECF No. 113 at 2.[1] Olives naturally contain the phenolic compounds oleuropein, hydroxytyrosol, and tyrosol. '808 Patent 2:9–30. Olive oil is a principal fat component of the Mediterranean diet, which has been linked to a lower incidence of certain ailments, such as coronary heart disease and some cancers. *Id.* 2:9–14. Massive amounts of "waste water" or "vegetation water" are produced as a byproduct of olive oil production. Discarding this water creates a significant economic burden for olive oil mills. *See* Francesco Visioli, et al., 47 *Antioxidant and Other Biological Activities of Olive Mill Waste Waters*, J. Agric. Food Chem., 3397–3401 (1999), *available at* Marshall Decl. Ex. D, ECF No. 103-2. Because of the known health benefits of olives and olive extracts, efforts have been made to leverage olive mill vegetation water for therapeutic uses, rather than simply discarding the water as waste. CreAgri obtained, and asserted in the instant litigation, two patents covering certain compositions of phenols derived from this waste water and uses thereof. '808 Patent; '599 Patent.

The '808 Patent, entitled "Method of Obtaining a Hydroxytyrosol-Rich Composition from Vegetation Water," claims, despite its title, *compositions* of olive-derived dietary supplements containing hydroxytyrosol and oleuropein or hydroxytyrosol and tyrosol at certain weight ratios. *See* '808 Patent at 3:43–51. The '808 Patent contains two independent claims and four dependent claims, all of which CreAgri asserted in this case. Independent claim 1 recites a range of hydroxytyrosol-to-oleoeuropein weight ratios and reads as follows:

> A dietary supplement comprising an aqueous extract of olives containing a weight ratio of hydroxytyrosol to oleoeuropein of between about 5:1 and about 200:1.

Claims 2 through 4 depend from claim 1. Claim 2 recites a narrower range of hydroxytyrosol-to-oleoeuropein weight ratios. Claim 3 recites a dried supplement in powder form, and claim 4 recites

---

[1] Phenolic compounds are compounds with one or more phenol (-$C_6H_5OH$) groups. ECF No. 103 at 2. A compound with more than one phenol group is a polyphenol.

Case No.: 11-CV-6635-LHK
ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES

United States District Court
For the Northern District of California

<div align="center" style="writing-mode: vertical-rl;">

**United States District Court**
For the Northern District of California

</div>

1 an extract "in the form of a tablet, capsule, pill, or confection food additive." Independent claim 5

2 is similar to claim 1 except that it recites a range of hydroxytyrosol-to-tyrosol weight ratios:

3     A dietary supplement comprising an aqueous extract of olives containing a weight ratio of
hydroxytyrosol to tyrosol of between about 3:1 and about 50:1.

5 Dependent claim 6 recites a narrower range of hydroxytyrosol-to-tyrosol weight ratios. On August

6 31, 2001, CreAgri filed the application that issued as the '808 Patent on July 9, 2002. *Id.*

7     The '599 Patent, entitled "Method for Treatment of Inflammation," relates to using olive

8 plant extracts to "treat[] AIDS-associated neurological disorders, inflammation and inflammation-

9 associated disorders." '599 Patent 1:10–14 ("Field of the Invention"). The claims recite methods

10 for treating specified inflammatory conditions with various mixtures of hydroxytyrosol or

11 hydroxytyrosol and oleuropein. *See* '599 Patent. The '599 Patent contains two independent claims

12 and fourteen dependent claims. The first independent claim, claim 1, reads as follows:

13     A method of treating a subject having an inflammatory condition characterized by a
detectable clinical symptom or change in a level of a biochemical marker with respect to
the normal range of the marker, the method comprising:
    administering to the subject a dose corresponding to between about 0.1 mg/kg body
weight and 2000 mg/kg body weight daily of a first treatment agent comprised of an
olive plant extract having a weight ratio of hydroxytyrosol to oleuropein of between
about 1:1 and about 200:1; and
continuing said administration until there is observed a return of the marker level to the
normal range or a desired change in the clinical symptom,
where the marker or the clinical symptom is selected from the group consisting of
    (i) elevated levels of C-reactive protein in the case of coronary inflammation;
    (ii) respiratory distress in the case of bronchial inflammation; and
    (iii) elevated CSF levels of isoprostanes or clinical symptoms determined from
neuropsychological testing in the case of neuro inflammation.

21 All fourteen of the dependent claims depend from claim 1. The other independent claim, claim 16,

22 uses a slightly different therapy—substantially purified hydroxytyrosol and oleuropein—to treat a

23 broader set of conditions:

24     A method of treating an inflammatory condition in a subject in need of such treatment,
comprising administering to said subject a dosage amount corresponding to between about
0.1 mg/kg body weight and 2000 mg/kg body weight daily of substantially purified
hydroxytyrosol or a substantially purified mixture of hydroxytyrosol and oleuropein,
wherein said inflammatory condition is in response to a condition selected from the group
consisting of: delayed type hypersensitivity reaction, psoriasis, an autoimmune disease,
organ transplant, pain, fever, and tissue graft rejection.

3

United States District Court
For the Northern District of California

The parties stipulated that "substantially purified" and "substantially purified mixture" in claim 16 meant "a compound or compounds that are removed from their natural environment, isolated and separated, and are at least 60% free from other components with which they are naturally associated," as described in the Patent's specification. '599 Patent, 5:21-27. On February 13, 2003, CreAgri filed the application from which the '599 Patent issued nearly a decade later on July 10, 2012. *Id.*

B.      **Procedural Background**

CreAgri filed its Complaint on December 23, 2011, alleging that olive-derived supplements created by Pinnaclife infringe the '808 Patent. ECF No. 1. On July 30, 2012, CreAgri amended its Complaint to allege infringement of the '599 Patent in addition to the '808 Patent. ECF No. 23. Pinnaclife moved to dismiss CreAgri's claims of infringement of the '599 Patent. ECF No. 27. The Court granted the motion as to indirect infringement but denied as to direct infringement, ECF No. 46.

CreAgri filed a Second Amended Complaint on January 22, 2013. ECF No. 50. Pinnaclife again filed a motion to dismiss the indirect infringement claims, ECF No. 54, which this Court denied, ECF No. 91. Pinnaclife answered and included counterclaims seeking declaratory judgments of invalidity and noninfringement of the '808 and '599 Patents, as well as a declaratory judgment that the '808 Patent was unenforceable due to inequitable conduct. *See* ECF No. 55.

While litigating the pleadings, Pinnaclife also filed a motion to compel CreAgri to comply with Patent Local Rule 3-1, which streamlines discovery and requires patentees to identify factual bases for their infringement allegations. ECF No. 34. After full briefing and a hearing, Magistrate Judge Paul Grewal denied Pinnaclife's motion in large part, finding that CreAgri had discharged its Patent Local Rule 3-1 obligations with respect to all claims of the '808 Patent and all but one claim of the '599 Patent. ECF No. 41 at 10. However, Judge Grewal ordered CreAgri to supplement its infringement contentions regarding indirect infringement, the doctrine of equivalents, and one claim of the '599 Patent. *Id.*

4

Case No.: 11-CV-6635-LHK
ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES

On April 16, 2013, after full briefing and a tutorial, the Court issued an order construing the disputed claims of the patents-in-suit. ECF No. 67 ("Claim Construction Order"). The Court construed disputed claims as follows:

| Claim Language | Construction |
| --- | --- |
| "comprising" or "comprised of" | "including but not limited to" |
| the preamble "a dietary supplement" in Claims 1 and 5 of the '808 Patent | the preamble "a dietary supplement" in Claims 1 and 5 of the '808 Patent is not a claim limitation. |
| weight ratios claimed in the '808 Patent | the claimed weight ratios in Claims 1 and 5 of the '808 Patent apply to the "aqueous extract of olives," not to the "dietary supplement." |
| weight ratio claimed in the '599 Patent | the claimed weight ratio in Claim 1 of the '599 Patent apply to the "olive plant extract." |
| "aqueous extract of olives" | "an aqueous solution containing a water-soluble preparation from an olive plant," with no restriction on the process by which the "aqueous solution" is obtained. |
| "clinical symptom" or "detectable clinical symptom" | "clinical symptom" or "detectable clinical symptom," as used in the '599 Patent, refers only to (1) respiratory distress in the case of bronchial inflammation, or (2) clinical symptoms determined from neuropsychological testing where those symptoms are related to neuro-inflammation.<br><br>Claim 1 of the '599 Patent does not include the limitation that a physician or a patient must observe the "clinical symptom" or "detectable clinical symptom." |
| "marker" or "biochemical marker" | "marker" or "biochemical marker," as used in the '599 Patent, refers only to (1) elevated levels of C-reactive protein in the case of coronary inflammation or (2) elevated CSF levels of isoprostanes in the case of neuro-inflammation.<br><br>Claim 1 of the '599 Patent does not include the limitation that a physician must measure, detect or observe the marker or biochemical marker. |

On April 26, 2013, Pinnaclife moved to determine the sufficiency of CreAgri's responses to certain Requests for Admissions. ECF No. 70. After full briefing, ECF Nos. 75–76, Judge Grewal held a hearing, ECF No. 95. At the hearing, Judge Grewal criticized Pinnaclife for framing the

Case No.: 11-CV-6635-LHK
ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES

requests so broadly that it would be impossible to respond to the requests and also criticized CreAgri for being evasive with privilege objections rather than responding more forthrightly. *Id.* The parties met and conferred during a break in the hearing and substantially narrowed their dispute, which Judge Grewal resolved on the record by ordering CreAgri to produce certain documents that CreAgri had previously agreed to produce and by ordering CreAgri to respond to one interrogatory regarding which the parties were not able to agree. *Id.* Judge Grewal also denied Pinnaclife's motion for discovery sanctions. *Id.*

Subsequently, CreAgri moved to disqualify Dr. Francesco Visioli, who was retained as Pinnaclife's expert, on the basis that Dr. Visioli had a previous confidential relationship with CreAgri. ECF No. 80. After full briefing, including a surreply, and a hearing, ECF Nos. 88, 94, the Court denied CreAgri's motion to disqualify. ECF No. 179. While the Court found that Dr. Visioli had a confidential relationship with CreAgri, the Court concluded that no confidential information related to the instant litigation was exchanged and that disqualification was not warranted. *See id.*

In addition, Pinnaclife and CreAgri cross-moved for summary judgment. *See* ECF Nos. 103, 106. CreAgri moved for summary judgment on infringement ("Pl. MSJ"), ECF No. 106, and Pinnaclife on invalidity ("Def. MSJ"), ECF No. 103. Both motions were fully briefed, with Pinnaclife cross-moving for summary judgment of non-infringement in its opposition to CreAgri's summary judgment motion. Finding both patents invalid, the Court entered summary judgment in favor of Pinnaclife. ECF No. 177 ("SJ Order").[2] Specifically, the Court found the '808 Patent invalid as anticipated, and the '599 Patent invalid for failure to satisfy the written description and enablement requirements under 35 U.S.C. § 112. *See* SJ Order at 16, 27, 35–36. The Court accordingly denied as moot CreAgri's motion for summary judgment of infringement, and dismissed without prejudice Pinnaclife's counterclaims for declaratory judgment of noninfringment of the '808 and '599 Patents and of unenforceability of the '808 Patent. *Id.* at 36. On January 3, 2014, the Court entered final judgment in favor of Pinnaclife. ECF No. 182.

---

[2] The parties had also filed various *Daubert* motions, which were denied as moot because the Court granted Pinnaclife's motion for summary judgment of invalidity.

6

Case No.: 11-CV-6635-LHK
ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES

On January 17, 2014, Pinnaclife moved for attorneys' fees under both 35 U.S.C. § 285 and Federal Rule of Civil Procedure 11. ECF Nos. 190 ("285 Mot."), 192 ("Rule 11 Mot."). CreAgri filed an Opposition to each Motion. ECF Nos. 194-6 ("285 Opp'n"), 194-4 ("Rule 11 Opp'n"). Pinnaclife filed two Replies. ECF Nos. 197 ("285 Reply"), 196 ("Rule 11 Reply"). While the motions were pending, on April 29, 2014, the Supreme Court issued its opinion in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014), which altered the Federal Circuit's standard for determining whether a case is "exceptional" under § 285. That same day, the Court requested supplemental briefs from the parties to address the effect of *Octane Fitness* on the attorneys' fees motions. Pinnaclife filed its Supplemental Brief on May 6, 2014. ECF No. 203 ("Supp. 285 Brief"). CreAgri filed its Opposition on May 13, 2014. ECF No. 204 ("Supp. 285 Opp'n"). Pinnaclife filed its Reply on May 16, 2014. ECF No. 205 ("Supp. 285 Reply").

## II.      LEGAL STANDARDS

### A.      Rule 11

Rule 11 of the Federal Rules of Civil Procedure imposes upon attorneys a duty to certify that they have read any pleadings or motions they file with the court and that such pleadings and motions are well-grounded in fact, have a colorable basis in law, and are not filed for an improper purpose. Fed. R. Civ. P. 11(b); *see also Business Guides, Inc. v. Chromatic Comm. Enters., Inc.*, 498 U.S. 533, 542 (1991) (under Rule 11 attorney who signs and files document with a court must certify that he or she "has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both, and is acting without any improper motive"). If a court finds Rule 11(b) has been violated, the court may impose appropriate sanctions to deter similar conduct. Fed. R. Civ. P. 11(c)(1); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) ("[T]he central purpose of Rule 11 is to deter baseless filings in district court."). However, "Rule 11 is an extraordinary remedy, one to be exercised with extreme caution." *Operating Eng'rs Pension Trust v. A–C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1988). Rule 11 sanctions should be reserved for the "rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose." *Id.* at 1344. "Rule

7

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   11 must not be construed so as to conflict with the primary duty of an attorney to represent his or

2   her client zealously." *Id*.

3          In determining whether Rule 11 has been violated, a "court must consider factual questions

4   regarding the nature of the attorney's pre-filing inquiry and the factual basis of the pleading."

5   *Cooter & Gell*, 496 U.S. at 399. A court must also consider whether "a pleading is warranted by

6   existing law or a good faith argument for changing the law." *Id*. However, courts should "avoid

7   using the wisdom of hindsight and should test the signer's conduct by inquiring what was

8   reasonable to believe at the time the pleading, motion, or other paper was submitted." Fed. R. Civ.

9   P. 11 Advisory Comm. Notes (1993 Amendments). The Advisory Committee Notes for Rule 11

10  explain that "Rule 11 motions . . . should not be employed . . . to test the sufficiency or efficacy of

11  allegations in the pleadings; other motions are available for those purposes." *Id*.; *see also Safe-*

12  *Strap Inc. v. Koala Corp.*, 270 F. Supp. 2d 407, 416 (S.D.N.Y. 2003) (noting that Rule 11 should

13  not be used to raise issues of legal sufficiency that more properly can be disposed of by a motion to

14  dismiss or a motion for summary judgment). "[T]he imposition of a Rule 11 sanction is not a

15  judgment on the merits of an action. Rather, it requires the determination of a collateral issue:

16  whether the attorney has abused the judicial process, and, if so, what sanction would be

17  appropriate." *Cooter & Gell*, 496 U.S. at 396.

18          In patent infringement cases, the Court applies regional circuit law to Rule 11 motions. *See*

19  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010); *Phonometrics, Inc. v.*

20  *Economy Inns of Am.*, 349 F.3d 1356, 1361 (Fed. Cir. 2003). In the Ninth Circuit, Rule 11

21  sanctions are appropriately imposed where: (1) a paper is filed with the court for an improper

22  purpose; or (2) the paper is "frivolous." *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328,

23  1338 (Fed. Cir. 2007). "A 'frivolous' argument or claim is one that is '*both* baseless *and* made

24  without a reasonable and competent inquiry.'" *S. Bravo Sys, Inc. v. Containment Techs. Corp.*, 96

25  F.3d 1372, 1375 (Fed. Cir. 1996) (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358,

26  1362 (9th Cir. 1990)) (emphasis added). Accordingly, when sanctions are sought on the basis of a

27  complaint, the Court must determine: "(1) whether the complaint is legally or factually 'baseless'

28

8

from an objective perspective, and (2) if the attorney has conducted 'a reasonable and competent inquiry' before signing and filing it." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002).

The Federal Circuit, applying Ninth Circuit law, stated that the second prong—a reasonable and competent inquiry—in the patent context requires "at a minimum, that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300 (Fed. Cir. 2004). The district court need not determine whether plaintiff's pre-filing interpretation of the asserted claims was correct, but rather only whether such interpretation was frivolous. *Id.* at 1301. "Claim interpretation is not always an exact science, and it is not unusual for parties to offer competing definitions of even the simplest claim language." *Id.* Nevertheless, even in the patent context, the Federal Circuit has acknowledged that a defective pre-filing inquiry alone is not sanctionable if the complaint is not objectively baseless. *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 985 n.4 (Fed. Cir. 2000) ("The 9th Circuit has held that an attorney may not be sanctioned under Rule 11 for a complaint that is not well-founded, so long as she conducted a reasonable inquiry nor may she be sanctioned for a complaint which is well-founded, solely because she failed to conduct a reasonable inquiry.").

### B.   Section 285

In addition to seeking attorneys' fees under Rule 11, Pinnaclife also moves for a determination that the instant case is exceptional under 35 U.S.C. § 285. In contrast to Rule 11, the issue of attorneys' fees in patent infringement cases under § 285 is controlled by Federal Circuit law. *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1343 (Fed. Cir. 2001). Pursuant to 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The Supreme Court recently rejected the Federal Circuit's legal test for determining whether a case is exceptional under § 285. *See Octane Fitness*, 134 S. Ct. at 1756. Under the previous standard, articulated by the Federal Circuit in *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005), a case was deemed "exceptional" only if

**United States District Court**
For the Northern District of California

9

a district court either found litigation-related misconduct of an independently sanctionable magnitude—such as Rule 11 violations—or determined that the litigation was both "brought in subjective bad faith" and "objectively baseless."

In *Octane Fitness*, the Supreme Court rejected such a formal approach and held that an exceptional case under § 285 is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1751. The Supreme Court also held that district courts "may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id*. Under the Supreme Court's new test, "a case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id*. at 1757. The Supreme Court also rejected the Federal Circuit's requirement that a party show subjective bad faith and objective baselessness by clear and convincing evidence. *Id*. at 1758. Rather, entitlement to fees under § 285 need only be shown by a preponderance of the evidence. *Id*. In addition, in a companion case, the Supreme Court clarified that on appellate review of exceptional case determinations, the Federal Circuit should apply the abuse of discretion standard. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014).

## III.    DISCUSSION

Pinnaclife contends that CreAgri should be sanctioned under Rule 11 for filing the complaints in the instant case and that the case should be deemed exceptional under § 285 on three bases. *First*, Pinnaclife contends that CreAgri's investigation before filing the complaints was inadequate. More specifically, Pinnaclife challenges the adequacy of CreAgri's pre-filing investigation into the compositions of the accused products (i.e., the hydoroxytyrosol-to-oleuropein and hydoxytyrosol-to-tyrosol weight ratios that are a limitation of all but one of the asserted claims). Rule 11 Mot. at 3 ("CreAgri acted unreasonably in failing to procure the accused products—despite their public availability on the internet—and made no effort to test the

10

compositions of the dietary supplement products it accused of infringement before filing suit."). *Second*, Pinnaclife contends that CreAgri's inadequate pre-investigation inquiry led to an objectively baseless suit. Specifically, Pinnaclife suggests that CreAgri's infringement case was objectively baseless, since there was no evidence that Pinnaclife's products contained the requisite ratios of hydroxytyrosol to oleuropein or hydroxytyrosol to tyrosol to infringe the Patents-in-Suit. *Third*, Pinnaclife contends that CreAgri took positions during the course of discovery for the purpose of stonewalling Pinnaclife from understanding the allegedly inadequate nature of CreAgri's pre-filing investigation. Supp. 285 Brief at 3. All three of these contentions with respect to CreAgri's litigation strategy and the merits of CreAgri's case relate to *infringement*, an issue that this Court did not address at the dispositive motion stage because the Court granted summary judgment of invalidity. Therefore, Pinnaclife seeks attorneys' fees on the basis of CreAgri's infringement case despite the fact that Pinnaclife has only prevailed in securing an invalidity judgment.

The Court will address each of Pinnaclife's contentions in detail below. However, before the Court does so, a brief comment on the legal standards and the relationship between Rule 11 and Section 285 is in order. To sanction a party under Rule 11, the Court must find that the party has both engaged in an inadequate investigation and that the party's claims are objectively baseless. *View Eng'g*, 208 F.3d at 985 n.4. Therefore, Rule 11 sanctions would only be appropriate if Pinnaclife was correct on both of its first two contentions (i.e., that CreAgri's pre-filing investigation was inadequate and that CreAgri's infringement case was objectively baseless). Section 285 differs, particularly after *Octane Fitness*. Under the pre-*Octane Fitness* § 285 standard, a case could only be found to be exceptional where the losing party engaged in litigation misconduct that was independently sanctionable or where the losing party's claims were both objectively baseless and brought in bad faith. *Brooks Furniture*, 393 F.3d at 1381. This means that Pinnaclife would have had to show that CreAgri's conduct was sanctionable under Rule 11 or that CreAgri's claims were both objectively baseless and brought in subjective bad faith. Therefore, at a minimum, to prevail on § 285 under pre-*Octane Fitness* law, Pinnaclife would have to prove that it

11

was correct on its second contention, the baselessness of CreAgri's case, because baselessness would have been required under either *Brooks Furniture* alternatives. However, the post-*Octane Fitness* § 285 inquiry is less rigid and more holistic. Under the new standard, no bright-line rules define the parameters of what is exceptional, and no single element (such as baselessness or sanctionability) is dispositive. Rather, the inquiry requires the Court to consider a totality of the circumstances and to exercise its equitable discretion. *See Octane Fitness*, 134 S. Ct. at 1756 n.6 (analogizing to the Copyright Act context where the Supreme Court has instructed district courts applying a similar fee-shifting provision to consider a "nonexclusive list of factors, including frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." (internal quotation marks omitted)).

###### A. Pre-Filing Investigation

The Court begins by discussing the adequacy of CreAgri's pre-filing investigation. As discussed above, Pinnaclife's central contention is that CreAgri should have purchased and chemically tested Pinnaclife's products before filing the complaints. Pinnaclife contends that such testing would have revealed that Pinnaclife's products do not contain the requisite hydroxytyrosol-to-oleuropein or hydroxytyrosol-to-tyrosol ratios to infringe the patents-in-suit. Pinnaclife must demonstrate inadequacy of pre-filing investigation to prevail on its Rule 11 motion, and the adequacy of pre-filing investigation is a factor that the Court considers in its § 285 analysis.

The Federal Circuit has stated that an adequate pre-filing investigation into infringement requires "at a minimum, that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." *Q–Pharma, Inc.*, 360 F.3d at 1300. The Federal Circuit has found pre-filing investigation inadequate where the patentee fails to conduct "*any* claim construction analysis *or* an infringement analysis prior to filing its counterclaim for infringement." *Id*. at 1302 (emphases added).

The two leading cases on pre-filing inquiry are *View Eng'g* and *Q-Pharma*, both of which arose in the Rule 11 context. In *View Eng'g*, View brought a claim for declaratory relief, seeking a

Case No.: 11-CV-6635-LHK
ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

declaratory judgment that Robotic's patent was invalid, or in the alternative, a finding of no infringement. 208 F.3d at 983–84. The sanctioned party, Robotic, filed counterclaims of infringement against View on eight patents containing 120 distinct claims. *Id*. When Robotic filed its counterclaims, it had not seen View's products and in fact admitted that it had no factual basis for the counterclaims. *Id*. at 984. The "only basis for their filing" was the belief of one of the client's engineers "that the View devices probably infringed the Robotic patents." *Id*. at 985. The engineer's belief was based "solely on his knowledge of the Robotic patents, View's advertising, and the statements View made to its own customers." *Id*. Robotic never had physical access to the accused View devices before filing 120 counterclaims of infringement of eight patents. *Id*. As the accused devices cost "several hundred thousand dollars," no attempt was made to purchase one. *Id*. at 985 n.5.

Robotic's counsel did not perform any independent claim construction analysis or any formal written infringement analysis before filing the counterclaims against View. Rather, Robotic relied entirely on the engineer's review of the technology and Robotic's counsel's own "review of the patents-in-suit and View's literature." *Id*. at 985. Ultimately, Robotic's counsel filed counterclaims on eight patents containing 120 distinct claims based on the client's view that "it was likely that View would infringe the eight patents, and [the fact that the attorney] had no information which would lead him to a different conclusion." *Id*. (internal quotation marks omitted).

The Federal Circuit in *View Eng'g* found that the inquiry into View's infringement performed by Robotic's counsel was not reasonable under Rule 11. The Federal Circuit noted that four months passed between the time View filed for declaratory judgment against Robotic and when Robotic counterclaimed, and listed several alternative courses of action that could have led to a contrary result. *Id*. at 986. According to the Federal Circuit, those four months provided Robotic ample time to: (1) construe the 120 claims asserted against View; (2) file a protective order that would open discovery into the accused devices for inspection and comparison with Robotic's patents; (3) appoint an outside expert to review View's machines; or (4) talk to Robotic's own sales

13

1    representatives to learn what those representatives knew about View's machines. *Id*. Ultimately,

2    the Federal Circuit in *View Eng'g* held that it is, "[t]he presence of an infringement analysis [that]

3    plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent

4    infringement case under Rule 11." *Id*.

5         In contrast, in *Q-Pharma* the complaining party, Jergens, contended that Q-Pharma's pre-

6    filing investigation was inadequate under Rule 11. *Q-Pharma*, 360 F.3d at 1300. Jergens argued

7    that: (1) Q-Pharma's pre-filing claim construction, if any, was frivolous; and (2) Q-Pharma's

8    reliance on Jergens' advertising alone did not amount to a reasonable effort to determine whether

9    the accused product satisfied the asserted claim limitations, especially because Q-Pharma could

10   easily have conducted a chemical analysis of the accused product. *Id*.

11        Finding these contentions unpersuasive, the Federal Circuit in *Q-Pharma* rejected Jergens'

12   argument interpreting *View Eng'g* to mean that "reliance on advertising as a basis for filing an

13   infringement suit is not sufficient under Rule 11." *Id*. at 1302. Rather, the Federal Circuit explained

14   that in *View Eng'g* the Federal Circuit affirmed the district court's award of Rule 11 sanctions

15   "because the patentee's reliance on the accused infringer's advertising statements *alone* did not

16   provide an adequate factual basis to support the patentee's infringement counterclaim." *Id*.

17   (emphasis added). "Importantly, [the court in *View Eng'g*] held that sanctions were warranted

18   because the patentee had not performed *any* claim construction analysis or an infringement analysis

19   prior to filing its counterclaim for infringement." *Id*. (emphasis added). The *Q-Pharma* court held

20   that unlike Robotic in *View Eng'g*, "Q-Pharma did not file suit based solely on Jergens'

21   advertising; critically, it also relied on its own comparison of the asserted claims with the accused

22   product." *Id*. Emphasizing that "an infringement analysis can simply consist of a good faith,

23   informed comparison of the claims of a patent against the accused subject matter," the Federal

24   Circuit in *Q-Pharma* found the following pre-filing investigation reasonable: (1) obtaining a

25   sample of the accused product without analyzing it; (2) reviewing the defendant's advertising and

26   labeling statements; and (3) most importantly, comparing the claims of the patent with the accused

27   product. *Id*. at 1302–03.

28

14

1    In the instant case, Paul Andre, lead counsel for CreAgri, states that CreAgri's counsel

2  "carefully reviewed the Patents-in-Suit, their written descriptions, and file histories in order to

3  interpret the claims" and then "reviewed all the publicly available information about [Pinnaclife's]

4  products to determine whether it had a reasonable basis to allege that Pinnaclife infringed the

5  claims of the Patents-in-Suit." Declaration of Paul Andre ("Andre Decl."), ECF No. 194-8 ¶ 3.

6  Specifically, CreAgri's attorneys reviewed: "(1) labeling information for Pinnaclife's products, (2)

7  all technical and non-technical publications that described the Pinnaclife products, (3) the

8  Pinnaclife website, (4) pending patent applications filed by Pinnaclife's President, (5) Pinnaclife's

9  promotion of its products for use in treating inflammation, and (6) all prior communications

10  between CreAgri and Pinnaclife's principals." *Id*. Based on the publicly available information

11  about the accused product and "a comparison of each claim element of the Patents-in-Suit, CreAgri

12  filed the instant case with the good-faith belief that Pinnaclife infringed the Patents-in-Suit." *Id*.

13    CreAgri's review of Pinnaclife's product labels revealed that they contained "A Patent

14  Pending proprietary blend of…Olive Fruit Extract (Hydroxytyrosol 7% standardized)." Rule 11

15  Opp'n at 11. According to CreAgri and Dr. Crea, the presence of "7% standardized percentage of

16  hydroxytyrosol from an olive fruit extract gave one of skill in the art enough to reasonably

17  conclude that Pinnaclife's products contain the ratios of hydroxytyrosol to oleuropein and tyrosol

18  in the claims of CreAgri's '808 and '599 Patents." *Id*.

19    CreAgri also reviewed two pending patent applications filed by Pinnaclife's president in

20  2010, the specifications for which included statements that hydroxytyrosol in the claimed invention

21  "may be obtained as an extract of, or otherwise derived from, olive leaves, olive fruits, and

22  vegetation water of olive oil production," and that "[w]hen obtained as an extract, for example, of

23  olive leaves, the extract will contain hydroxytyrosol, tyrosol, oleuropein, and other polyphenols."

24  *Id*. at 12; *see also* Andre Decl., Ex. 4 at 4, ¶ [0031], Ex. 5 at 5, ¶ [0041]. In addition, before filing

25  its Complaint, CreAgri unsuccessfully sought information from Pinnaclife about the accused

26  product's formulations and the source of the hydroxytyrosol in the accused products. Rule 11

27  Opp'n at 12.

28

15

The Court finds that the pre-filing investigation in this case far exceeds that in *View Eng'g* and is akin to that in *Q-Pharma*. Whereas the sanctioned party in *View Eng'g* "performed neither a formal nor an informal analysis of any sort," 208 F.3d at 986, CreAgri's counsel (1) reviewed the Patents-in-Suit, their written descriptions, and file histories to interpret the claims, (2) reviewed all publicly available information about the accused products and pending patents filed by Pinnaclife's president that CreAgri believed might be related to the accused products, and (3) compared each claim element of the patents-in-suit to the accused products in light of what they had learned about them, ultimately concluding that Pinnaclife infringed the Patents-in-Suit. Andre Decl. ¶ 3. Also, unlike the sanctioned party in *View Eng'g*, it is undisputed that in this case CreAgri "served discovery immediately after the case began to confirm Pinnaclife's infringement." Rule 11 Opp'n at 14.

CreAgri's pre-filing conduct closely resembles the investigation in *Q-Pharma*, which the Federal Circuit found to satisfy Rule 11. The sole distinction is that CreAgri did not actually obtain the accused product. However, that difference is immaterial considering the facts of *Q-Pharma*. In *Q-Pharma*, after obtaining a sample of the accused product, the patentee concluded "that chemical analyses identifying the actual percentage of $CoQ_{10}$ in the accused product would not likely have changed its infringement analysis." *Id*. at 1303. Thus even though the patentee obtained a sample and could have performed a chemical analysis of the accused product without incurring substantial expense, the patentee's failure to do so did not render its pre-filing investigation insufficient or unreasonable. *Id*. Here, CreAgri contends that testing Pinnaclife's products would not have affected CreAgri's infringement analysis because testing would not have revealed the ratios of hydroxytyrosol, oleuropein, and tyrosol in the olive fruit extract, which is the critical determinate. Rather, CreAgri contends that testing Pinnaclife's product would only have revealed the ratios in the final product. Rule 11 Opp'n at 12–13. Despite the fact that Pinnaclife contends that testing the final products would have been fruitful, there is no reason to think that CreAgri needed to obtain a sample of the accused product to determine that testing would not affect its infringement analysis. Regardless of whether testing would have provided evidence of infringement, CreAgri's

Case No.: 11-CV-6635-LHK
ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES

1    determination that it need not test the accused products was reasonable in light of its infringement

2    theory, that it was the fruit extract, rather than the accused products, that needed to contain the

3    requisite ratios. Pinnaclife and its expert admit that testing the ratios in the final product would not

4    have provided information about the ratios in the olive fruit extract. Rule 11 Reply at 10 ("[I]t

5    would be impossible to obtain the concentration of olive phenols in the olive fruit extract

6    ingredient by testing the final accused products.").

7         The reasonableness of this determination is bolstered by the fact that CreAgri prevailed on

8    the dispute regarding whether the ratios need to be in the final product or in the olive extract

9    ingredient at claim construction. Specifically, CreAgri proposed construing the weight ratios (of

10   hydroxytyrosol to oleuropein in Claim 1 and hydroxytyrosol to tyrosol in Claim 5 of the '808

11   Patent) as applying to the "aqueous extract of olives" ingredient of the final product. In contrast,

12   Pinnaclife sought a construction under which these ratios would apply to the final dietary

13   supplement itself. Similarly, with respect to the weight ratios in the '599 Patent, CreAgri sought a

14   construction under which the ratios would apply to the "olive plant extract," while Pinnaclife

15   sought to apply the ratios to the "first treatment agent." On both, CreAgri prevailed. The Court held

16   that the weight ratios applied to the "aqueous extract of olives" and to the "olive plant extract"—

17   not to the "dietary supplement" or the "first treatment agent." Claim Construction Order at 20.

18        In sum, the Court concludes that the pre-filing investigation in this case was akin to that in

19   *Q-Pharma*. The sole difference, that CreAgri did not purchase Pinnaclife's products, is not

20   material, particularly in light of CreAgri's infringement theory that infringement stemmed from the

21   chemical makeup of a component of the product rather than the chemical makeup of product itself.

22   The Court's finding that the pre-filing investigation in the instant case was adequate would by itself

23   be a sufficient basis for denial of Pinnaclife's Rule 11 Motion. Nevertheless, the Court turns to the

24   second prong of the Rule 11 inquiry, objective baselessness, which provides an independent basis

25   for denial of Pinnaclife's Rule 11 Motion and is a part of the analysis of the totality of the

26   circumstances for Pinnaclife's § 285 Motion.

27

28

17

**B.      Objective Baselessness**

Pinnaclife asserts that CreAgri's allegation that Pinnaclife's products satisfied the composition limitations of the patents-in-suit was objectively baseless. That is, Pinnaclife contends that CreAgri never had a reasonable chance of proving that the accused products contain the claimed hydroxytyrosol-to-oleuropein or hydroxytyrosol-to-tyrosol ratios. To address this contention, the Court must evaluate the cross-motions for summary judgment of infringement and non-infringement. Importantly, however, the inquiry at this stage is whether CreAgri's infringement case was objectively baseless at the time the complaints were filed, not who, if anyone, would have prevailed on the cross-motions for summary judgment. The Federal Circuit has stated, pre-*Octane Fitness*, that "to be objectively baseless, the patentee's assertions—whether manifested in its infringement allegations or its claim construction positions—must be such that no reasonable litigant could reasonably expect success on the merits." *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1327 (Fed. Cir. 2013) (internal quotation marks omitted);

Before turning to the merits of CreAgri's infringement case, the Court notes that Pinnaclife's contention that CreAgri's infringement case was objectively baseless is undermined by the fact that CreAgri substantially prevailed at the claim construction phase with regard to the claim terms related to the portions of CreAgri's infringement theory that Pinnaclife now attacks. Specifically, as described above, CreAgri prevailed with respect to its contention that the weight ratios in the '808 Patent and the '599 Patent applied to olive extracts that were a component of the final product, rather than the final product itself.

Furthermore, CreAgri largely prevailed on construction of the term "aqueous extract of olives" in Claims 1 and 5 of the '808 Patent. CreAgri proposed construing the term to mean "a water-soluble preparation from an olive plant," while Pinnaclife proposed "an aqueous solution containing water-soluble compounds obtained by washing and pressing olive fruit." *Id.* at 23. In addition, Pinnaclife sought to construe "an aqueous extract" to exclude an "aqueous-alcoholic extract" or a powder. *Id.* The Court noted that the construction of "an aqueous extract of olives" raised three questions: (1) whether "aqueous extract" must be a solution or whether it may be a dry

Case No.: 11-CV-6635-LHK
ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES

or powder extract that was derived using water; (2) whether the "olive" component must be derived from the olive fruit or whether it may be derived from any part of the olive plant; and (3) whether the "olive" component must be obtained by washing and pressing. The Court agreed with Pinnaclife that an "aqueous extract" must be a solution containing a water-soluble preparation, but agreed with CreAgri that "olive" does not just refer to the olive fruit and that the dietary supplement need not be obtained by washing and pressing the fruit. *Id.* at 24-32.  Accordingly, the Court construed "aqueous extract of olives" as "an aqueous solution containing water-soluble preparation from an olive plant." *Id.* at 32. In sum, on claim construction issues closely related to the issues on which Pinnaclife contends that CreAgri conducted an inadequate investigation, CreAgri prevailed, undermining Pinnaclife's contention that CreAgri's case was objectively baseless since its inception.

The Court now turns to the merits of Pinnaclife's objective baselessness allegation. In the instant motions, Pinnaclife contends that CreAgri's infringement case was objectively baseless for four reasons. 285 Mot. at 20-21; Rule 11 Mot. at 4-5. First, Pinnaclife asserts that there is no evidence regarding any ratio of hydroxytyrosol to tyrosol. Second, Pinnaclife contends that all of its products contain more oleuropein than hydroxytyrosol, because the products contain more oleuropein-rich olive leaf than hydroxytyrosol-rich olive fruit. This, Pinnaclife contends, renders CreAgri's case objectively baseless because all of the ratios in all of the asserted claims require more hydroxytyrosol than oleuropein. Third, Pinnaclife contends that the accused products do not contain "substantially purified" compounds, because the olive fruit extract ingredient contains only 7% hydroxytyrosol. Fourth, Pinnaclife contends that the accused products are powders, not aqueous extracts, and therefore cannot infringe.

The Court concludes that none of these contentions establishes that no reasonable litigant in CreAgri's position could reasonably have expected success on the merits for the reasons stated below. First, regarding the hydroxytyrosol-to-tyrosol weight ratios, CreAgri presented evidence that Pinnaclife obtained from its supplier OlivePure Fruit extract, which was used in the accused products. This extract, provided by the supplier and used in the accused products, contained 7%

hydroxytyrosol and 1% to 2% tyrosol.  German Rep. ¶ 75. This meant that the hydroxytyrosol-to-tyrosol ratio of the extract would have been between 3.5:1 and 7:1, which fell within the 3:1 to 50:1 range of Claim 5 of the '808 Patent. *Id.* Importantly, Dr. Visioli, Pinnaclife's expert, did not dispute that this was the composition of the supplier-provided extract. Lee Decl, Ex. 21 ("Visioli Dep.") at 248:24-249:1. In light of this evidence, the Court concludes that it was reasonable for CreAgri to pursue an infringement case as to Claim 5 of the '808 Patent.

Second, as to Pinnaclife's contentions with respect to the hydroxytyrosol-to-oleuropein ratios, CreAgri presented in its summary judgment motion substantial evidence obtained in discovery. Specifically, CreAgri relied on its expert, who in turn relied on documentary evidence from Pinnaclife's supplier of olive extract, to establish the fact that the olive extract in the accused products contained the requisite hydroxytyrosol-to-oleuropein ratios. *See* Disclosures of Expert Testimony of Bruce German, ECF No. 158-15 ("German Rep.") at 14-15 (citing Decl. of Hannah Lee in Support of Pls. MSJ ("Lee Decl."), ECF No. 158-15, Ex. 26 (email from NatureX noting that "Olive fruit extract [is] 7% hydroxytyrosol" and "typical oleuropein concentration can be expected to range from .1% to 1% in this extract")).

Pinnaclife argues that the document from its supplier only gives information about the oleuropein concentration in the olive *fruit* extract in the accused products. Pinnaclife's central contention is that by focusing on the olive fruit extract in the accused products, CreAgri's infringement case was contrary to this Court's construction of "aqueous extract of olives" as "an aqueous solution containing water-soluble preparation from an olive *plant*." Def. Opp. to Pls. MSJ, ECF No. 161-8 at 13. Pinnaclife contends that the Court's construction's use of "water-soluble preparation from an olive plant" meant that the "aqueous extract of olives" *must* refer to all extract from all parts of the olive plant that are in the final product. CreAgri responds that the Court's reference to olive plant was not intended to *require* that all parts of the olive plant in the final product be considered. Rather, CreAgri suggests that the Court's construction merely opened the door to the possibility that the "aqueous extract olive" *may* refer to extracts from any part of the olive plant (the fruit or the leaf). In essence, CreAgri contends that the Court's construction is

20

merely a repudiation of Pinnaclife's claim construction position that "aqueous extract of olives" *must* refer to the extract of the olive fruit and not any other part of the olive plant. Pl. Reply ISO MSJ, ECF No. 160-1.

The Court finds that CreAgri's contention that the ratios in the olive fruit extract could by themselves support a finding of infringement is reasonable. In the Claim Construction Order, the Court concluded that "[t]he Court agrees with CreAgri that the term 'olives' should not be construed as referring *exclusively* to the olive fruit." Claim Construction Order at 30 (emphasis added). The Court specifically rejected Pinnaclife's proposed claim construction that an "'aqueous extract of olives' *must* be derived only from olive fruit." *Id.* (emphasis added). Nothing in the Court's Claim Construction Order suggests that the Court intended to limit the sources from which the aqueous extract may be derived. Rather, the Court's order rejects Pinnaclife's attempt to limit the parts of the olive to which "aqueous extract of olives" may refer. It is reasonable to read the Claim Construction Order, as CreAgri does, to suggest that "aqueous extract of olive" may encompass any part of the olive. Accordingly, the Court finds that CreAgri's contention that "aqueous extract of olives" may, but is not required to, be derived exclusively from olive fruit is reasonable.

Third, as to whether the accused products contained "substantially purified hydroxytyrosol or a substantially purified mixture of hydroxytyrosol and oleuropein," Pinnaclife contends that the olive fruit extract in the accused products contained only 7% hydroxytyrosol with the other 93% made up of components with which hydroxytyrosol is naturally associated. 285 Mot. at 21. According to Pinnaclife, this means that products did not contain "a compound or compounds that are removed from their natural environment, isolated and separated, and are at least 60% free from other components with which they are naturally associated," as the agreed-upon definition of "substantially purified" states. CreAgri's expert, however, disagrees. CreAgri's expert relied on internal documents from Pinnaclife's supplier to state that "water is used as an extraction solvent for the olive fruit extract and ethanol/water is the extraction solvent for the olive leaf extract." German Rep. ¶ 132. In light of these solvents, CreAgri's expert opined that "[t]he end result of

21

these extraction processes are extracts that are at least 60% free from other components with which they are naturally associated." *Id.* The Court cannot conclude that CreAgri's allegation that Pinnaclife infringed Claim 16 was unreasonable in light of the expert testimony that supports such an allegation.

Fourth, Pinnaclife's contention that the accused products are powders, not aqueous extracts, and therefore do not infringe is not persuasive in assessing the reasonableness of CreAgri's infringement case. Claims 1 and 5 of the '808 Patent requires "a dietary supplement *comprising* an aqueous extract of olives" containing the specified weight ratios. The Court adopted CreAgri's proposed construction of "comprising" as meaning "including but not limited to." Claim Construction Order at 8. Accordingly, the dietary supplement need only *include* an aqueous extract of olives. Nothing in the language of the claims or this Court's construction thereof requires the dietary supplement itself to be an aqueous extract of olives. In light of the language and the Court's construction, the Court finds that CreAgri reasonably pursued an infringement case notwithstanding the fact that the ultimate accused products were not themselves "aqueous extracts of olives."

Finally, while throughout the instant Rule 11 Motion Pinnaclife chastises CreAgri for not conducting a chemical analysis of the accused products, the summary judgment briefing reveals that Pinnaclife never conducted such an analysis either. Of course, on infringement, CreAgri bore the burden, and therefore Pinnaclife was not required to conduct any such analysis. Nonetheless, the Court notes that if such an analysis was as easy and dispositive as Pinnaclife contends, and if CreAgri's infringement case were as baseless as Pinnaclife contends in the instant motions, then Pinnaclife would likely have conducted the chemical analysis. 285 Mot. at 14 (noting the "ease and limited expense of available testing methods"); Rule 11 Mot. at 4 (contending that CreAgri's "infringement claims are factually baseless from an objective perspective). While Pinnaclife's failure to do so is not dispositive, it is certainly probative of the question of whether Pinnaclife has established that CreAgri's infringement case was objectively baseless.

Case No.: 11-CV-6635-LHK
ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES

In sum, CreAgri prevailed on two key issues at claim construction related to the hydroxytyrosol-to-tyrosol and hydroxytyrosol-to-oleuropein ratios. Furthermore, CreAgri provided, in conjunction with its summary judgment briefing, substantial evidence of infringement. Moreover, Pinnaclife itself never performed the testing that it contends would have decisively resolved this case. In light of all of these factors, the Court cannot conclude that CreAgri's infringement case was "objectively baseless."

### C.     Discovery Conduct

Last, the Court turns to Pinnaclife's contention that CreAgri acted unreasonably in discovery and obstructed Pinnaclife's ability to evaluate whether CreAgri's prefiling investigation was adequate. This issue, while not relevant to the Rule 11 inquiry, is relevant to the more holistic, totality-of-the-circumstances § 285 inquiry.

The purportedly problematic discovery conduct resulted from CreAgri's allegedly deficient responses to certain of Pinnaclife's Requests for Admissions that were served in April 2013. Pinnaclife contends that this alleged discovery obstruction prevented Pinnaclife from assessing the adequacy of CreAgri's pre-filing investigation. In the requests, Pinnaclife asked CreAgri to admit that "CreAgri did not purchase the Accused Products before December 23, 2011" and that "CreAgri did not Test the composition of the Accused Products before December 23, 2011." "Accused Products" was defined as several named products and "any other Pinnaclife product that Plaintiff has asserted, will assert, or believes has infringed or does infringe any of the Patents-in-Suit." ECF No. 191-9. CreAgri objected to the requests on the basis of attorney-client privilege, work-product doctrine, and that the request was vague and ambiguous, particularly in its definition of "Accused Products." ECF No. 191-10. Pinnaclife contended that these answers were particularly evasive and troublesome in light of the fact that Dr. Crea testified at his deposition a week after CreAgri submitted the responses to the Requests for Admissions as follows:

> Q.     Did you order any of the Pinnaclife products and examine them?
> A.     No.
> Q.     Did you or anyone who you instructed do any testing of the Pinnaclife products to determine what content of polyphenols the products contained?
> A.     No.

Case No.: 11-CV-6635-LHK
ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES

§ 285 Mot. at 19. Pinnaclife contends that CreAgri "amended its responses only after Pinnaclife brought a motion to determine the sufficiency of CreAgri's initial answers, but even then admitted only that CreAgri performed no 'physical testing' before filing the Complaint in this case." *Id.*

Pinnaclife misstates the record in an attempt to paint CreAgri as obstructionist. While Pinnaclife seems to suggest that CreAgri amended its responses after Pinnaclife brought its motion to test the sufficiency of the Requests for Admission, the record is to the contrary. In fact, CreAgri opposed Pinnaclife's motion. At a hearing on the motion before Judge Grewal, both parties indicated that they had not had the opportunity to meet and confer regarding the requests for admissions. Before taking a break and asking the parties to engage in such a meet and confer, Judge Grewal indicated that Pinnaclife's Requests for Admissions were overbroad and not ascertainable. Specifically, Judge Grewal was troubled by the definition of "Accused Products," asking Pinnaclife's counsel, "May I ask, why did you define your Accused Products so wildly overbroad? I mean, you are including products that aren't even ascertainable in the definition, right?" ECF No. 95 at 11:1-3. Pinnaclife's counsel even admitted that "I understand the future products and all that, it might be hard to form a response to the RFA," to which Judge Grewal stated "It's impossible." *Id.* at 11:12-16. To be sure, Judge Grewal was also troubled by CreAgri's assertion of privilege objections to the Requests for Admissions. However, after pointing out the unreasonableness in both sides' position, Judge Grewal asked the parties to meet and confer and to return at the end of the calendar if they still had outstanding disputes. It was at this point that CreAgri agreed to provide amended responses that were responsive and that were in accord with Dr. Crea's deposition testimony if Pinnaclife narrowed the scope of the requests so that the requests were not overbroad and non-ascertainable. Thus, the Court notes that the record paints a picture in which both sides were being too aggressive with their discovery positions, not, as Pinnaclife suggests, a situation in which CreAgri was being willfully obstructive in bad faith.

Pinnaclife suggests in passing that CreAgri's obstructionism with regard to the Requests for Admission was part of a broader practice. 285 Mot. at 19 ("CreAgri followed the same practice of failing to provide substantive information, forcing a motion by Pinnaclife, and subsequently

24

offering yet a further deficient response over and over again in this case. The pattern repeated itself with CreAgri's Infringement Contentions, its Interrogatory Responses, and even its pleadings." (internal citations omitted)). Again, the Court finds that Pinnaclife stretches the record to make this conclusory statement that is unsupported by any analysis. With respect to the Infringement Contentions, CreAgri largely prevailed on the Motion to Compel. Judge Grewal found that "Creagri's contentions provide sufficient information to Pinnaclife of its theories for infringement" on the '808 Patent. ECF No. 40 at 4. On the '599 Patent, Judge Grewal found supplementation of the infringement contentions necessary with respect to Claim 6, but found that "many of Pinnaclife's other arguments again overstate Creagri's obligations under Patent L.R. 3-1" and that supplementation as to the other claims of the '599 Patent was not necessary. *Id.* at 7. Finally, Judge Grewal concluded that CreAgri was required to supplement as to indirect infringement and doctrine of equivalents. *Id.* at 9-10. Far from an unmitigated finding that CreAgri was stonewalling, Judge Grewal's order suggests that CreAgri did not discharge its obligations under the Patent Local Rules with respect to certain narrow issues and that Pinnaclife was overreaching as to others. With regard to the Interrogatory Responses, which Pinnaclife now contends were evasive, amended responses were part and parcel of the meet and confer as to the Requests for Admission. Therefore, for the same reasons as those stated above, the Court concludes, as it did with respect to the Requests for Admissions, that the parties resolved the issue by compromise following the meet and confer. ECF No. 95 at 13:11-13 (Pinnaclife's counsel's statement that "As to the interrogatories, again we withdrew the motion as to a few of them and also have agreed on supplemental responses."). Finally, as to the pleadings, nothing about CreAgri's pleadings suggest bad faith obstructionism. Rather, Pinnaclife moved to dismiss CreAgri's Amended Complaint as to the '599 Patent. ECF No. 27. The Court denied the motion as to direct infringement, but granted the motion as to indirect infringement, finding that that CreAgri had not plead sufficient facts. ECF No. 46. The Court granted CreAgri leave to amend to plead additional facts, which CreAgri did. ECF No. 50. Again, Pinnaclife moved to dismiss the indirect infringement claims, ECF No. 54, but this time, the Court denied Pinnaclife's motion, finding CreAgri's allegations sufficient, ECF No. 91.

Case No.: 11-CV-6635-LHK
ORDER DENYING DEFENDANT'S MOTIONS FOR ATTORNEYS' FEES

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Granting in part a motion to dismiss with leave to amend and denying a subsequent motion to dismiss upon the addition of further allegations is not exceptional and is in fact quite routine. Therefore, the manner in which the case was litigated is much more complicated than the picture Pinnaclife paints in its motions. The record does not suggest that CreAgri litigated this case so unreasonably as to render it exceptional.

## IV.    CONCLUSION

Because Pinnaclife has not established that CreAgri's prefiling inquiry was inadequate or that CreAgri's infringement case was objectively baseless, the Court denies Pinnaclife's Rule 11 Motion. Further, the totality of the circumstances do not render this case exceptional under § 285. Accordingly, The Court DENEIS Pinnaclife's § 285 Motion.[3]

**IT IS SO ORDERED.**

Dated: June 3, 2014                                      *Lucy H. Koh*
                                                         _____
                                                         LUCY H. KOH
                                                         United States District Judge

---

[3] In its Opposition to the Rule 11 Motion, CreAgri seeks fees for having to oppose the Rule 11 Motion. However, CreAgri provides no legal authority or analysis for why it should be awarded such fees. CreAgri's request is therefore denied. Rule 11 Opp'n at 18-19.

26